IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 40122-7-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| MICHAEL RAY PERRY, | ) | |
| | ) | |
| Appellant. | ) | |

MURPHY, J. — A jury convicted Michael Perry of second degree murder. On appeal, Perry makes two assignments of error: (1) ineffective assistance of counsel based on multiple purported errors committed by his trial attorney, and (2) a violation of his constitutional right to present a defense based on the exclusion of proffered impeachment testimony. In a statement of additional grounds for review, Perry also asserts there were violations of his speedy trial and *Miranda*[1] rights, and a violation by the State of an order on its own motion in limine.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Discerning no reversible error, we affirm.

FACTUAL BACKGROUND

This case arises from the brutal stabbing death of John Trendowicz in room 115 of the Redtop Motel (Redtop) in Spokane Valley. Trendowicz had rented the room, and while in the room, various men had come to use drugs. Trendowicz's body was discovered by Leonard Silvey, The Redtop's security and maintenance manager, on June 10, 2023, which is the day focused on in the investigation with surveillance cameras capturing key events. Silvey was also a resident of the motel.

The last time John Trendowicz was seen outside of his room was on the evening of June 9 by Silvey and another Redtop resident, Terry Grimm, who resided in room 113 of the Redtop and sometimes assisted his friend Silvey with work at the motel. On the morning of June 10, at approximately 10:30 a.m., Grimm was sitting outside his room having coffee when he overheard a heated argument coming from room 115, including the shouted statement, "'Don't fucking yell at me, old man.'" 1 Rep. of Proc. (RP) (Oct. 24, 2023) at 301. Grimm recognized Trendowicz's voice but could not make out his exact words.

Shortly thereafter, around 10:39 a.m., Silvey and Grimm knocked on the door of room 115 to inquire about whether Trendowicz was going to check out of the Redtop that

day or if he would be paying to stay another night. Perry answered, extending only his head through the door, stating they would be staying another night. Grimm refused a request by Perry to borrow money for rent. Soon after, Silvey observed Perry leaving the motel on foot.

After about an hour had passed and no payment had been received, Silvey returned to room 115 and knocked on the door but no one answered. Silvey reported this to the motel owners, who told him to wait another hour and then try again. At 1:15 p.m., after again receiving no response and reporting back to the owners, Silvey entered room 115 and discovery Trendowicz's body face down in the shower, with water running and "blood everywhere." 1 RP (Oct. 24, 2023) at 289-90. Emergency personnel responded to the Redtop and Trendowicz was pronounced dead. An autopsy performed two days later by forensic pathologist Makinzie Moss, M.D., revealed Trendowicz had 51 stab and incised wounds, including fatal cuts to major organs.

*Witness accounts and video surveillance evidence*

Jason Wood, a friend of both John Trendowicz and Michael Perry, testified at trial under an immunity agreement that on the morning of June 10 he was in room 115 with Trendowicz and others using drugs. At some point that morning, Wood received a call from Perry, who arrived at the Redtop and joined them in the room. Wood testified

Trendowicz was alive when he left room 115 and denied seeing the body after the stabbing took place. On cross-examination, Wood admitted to heavy drug use that impaired his memory and that he afterward disappeared for days. Wood recalled waking up in the hospital some unknown number of days after the murder.

Surveillance footage from the Redtop spanning 8:00 a.m. to 1:15 p.m. on June 10, reviewed by lead investigator Detective James Hall of the Spokane County Sheriff's Office, helped provide a timeline of individuals entering and exiting Room 115. An individual later identified as Christopher Helms was seen entering room 115 at 8:34 a.m., coming and going multiple times, then leaving at 9:48 a.m. and not returning. Helms left with a bag, abandoned a black bike he arrived on, and appeared to run from the motel. Perry arrived at 9:35 a.m. on an orange bike, entered/exited room 115 until 10:08 a.m., interacted with Silvey and Grimm at 10:39 a.m., and departed room 115 for the last time at 11:06 a.m., having changed his clothes (different pants, added shirt, new hat). Perry was carrying extra bags and left walking his bike—not running. No one else entered or exited room 115 after Perry left until Silvey entered the room and found the body around 1:15 p.m.

*Post-crime events and investigation*

At around 6:00 p.m. or 7:00 p.m. on the same day that John Trendowicz was killed, Michael Scalera, an aviation enthusiast who has airplanes and a hangar at Felts Field, an airport not far from the Redtop, noticed smoke rising near the Spokane River. Scalera and his wife took their golf cart to go see if there was a fire, as they keep a seaplane on the river. Scalera found Perry in underwear and socks beside a fire that contained remnants of a denim jacket. Perry claimed someone else started the fire while he was away, despite no one else being nearby. Scalera provided Perry with some extra clothing he had at the airport—a flannel shirt and gray sweatpants—and drove Perry to the road.

The next morning, after learning of the murder from a news report, Scalera reported his encounter with Perry to law enforcement. An officer responded to interview Scalera, with Scalera eventually showing the officer where he had interacted with Perry, including a pit where the fire had been burning the day before.

Back on the day of the murder, Detective Hall was able to identify Michael Perry by comparing screenshots from the Redtop surveillance video to information in a law enforcement database. He arrested Perry that evening in the same vicinity where Scalera had earlier encountered Perry, near Felts Field and the Spokane River, with Hall later

5

learning that Perry was wearing the same clothes he had received from Scalera. While in custody, it was noted the Perry had a red stain on his head. It was swabbed and sent to the Washington State Patrol Crime Laboratory for processing. Analysis showed the stain consisted of a mixture of Perry and Trendowicz's DNA, with the odds of 4.5 octillion to one of a random match. Detective Hall also visited the burn pit pointed out by Scalera where he initially encountered Perry and found remnants of materials that matched the jacket Perry was seen wearing on the day of the murder.

Christopher Helms, the other person seen on the Redtop surveillance video on the morning of the murder, was located two days later during a welfare check, and appeared to be wearing the same clothes he had worn on June 10. Helms was formally interviewed on June 23, apparently wearing the same t-shirt and a rubberized bracelet as seen on June 10 and 12. Those two items were collected during the June 23 interview and tested, and showed no evidence of blood. Law enforcement eventually ruled Helms out as a suspect. A material witness warrant was issued for Helms in the weeks leading up to trial but he could not be located to testify.

In addition to the conviction for second degree murder, the jury by special verdict found (1) Perry committed the murder armed with a deadly weapon, and (2) he knew, or should have known, that John Trendowicz was particularly vulnerable or incapable of

resistance. The trial court sentenced Perry to an exceptional sentence of 421 months'

confinement.

Perry now timely appeals.

## ANALYSIS

### 1. INEFFECTIVE ASSISTANCE OF COUNSEL

Ineffective assistance of counsel claims present mixed questions of law and fact

that are reviewed de novo. *State v. Jones*, 183 Wn.2d 327, 338-39, 352 P.3d 776 (2015).

Under the Sixth Amendment to the United States Constitution and article I, section 22 of

the Washington State Constitution, defendants are entitled to effective counsel. *Strickland*

*v. Washington*, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v.*

*Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). To prevail on a claim of ineffective

assistance, Perry must show both (1) deficient performance falling below an objective

standard of reasonableness, and (2) prejudice—a reasonable probability of a different

outcome absent the deficiency. *Strickland*, 466 U.S. at 687. There is a strong presumption

that counsel's conduct was reasonable and tactical decisions, including objections, are

not deemed to be deficient unless egregious. *Grier*, 171 Wn.2d at 33; *State v. Kyllo*,

166 Wn.2d 856, 862-63, 215 P.3d 177 (2009); *State v. Johnston*, 143 Wn. App. 1, 19,

177 P.3d 1127 (2007). Failure to prove either prong defeats an ineffective assistance of counsel claim. *Strickland*, 466 U.S. at 700.

### 1.1 Lack of objections

Michael Perry contends his trial counsel was ineffective by failing to object to: (A) unauthenticated surveillance footage and screenshots, (B) narration by law enforcement officers of unadmitted surveillance footage, (C) prejudicial booking photos admitted into evidence, (D) identification by law enforcement of Perry and Helms on surveillance footage, (E) improper opinion testimony by Detective Hall, and (F) admission of DNA and blood evidence relative to a claim of failure to prove chain of custody. We address each of Perry's claims in the order presented.

### A. Surveillance footage and screenshots

Michael Perry claims his counsel was deficient for failing to object to the following unauthenticated exhibits related to surveillance footage at the Redtop: (1) video footage showing Perry leaving room 115 at 11:06 a.m., (2) screenshots taken of Perry from this same footage, and (3) screenshots taken of video footage of Christopher Helms. To comply with the authentication or identification requirements of ER 901(a), it is sufficient for the proponent of evidence to show that a reasonable juror would find an

item is what it purports to be—a low bar. *State v. Sapp*, 182 Wn. App. 910, 914-15, 332 P.3d 1058 (2014); *State v. Hillman*, 24 Wn. App. 2d 185, 190-91, 519 P.3d 593 (2022).

The Redtop's security and maintenance manager, Leonard Silvey, and resident Terry Grimm, testified about the surveillance system at the motel and the events captured on that video footage in addition to their personal observations that day. Both identified Michael Perry in the surveillance footage. Sergeant Jennifer Sutter testified about the onsite retrieval of the motel's surveillance video and the accuracy of screenshots taken from that footage. Detective Hall also testified to the identification processes through utilization of the surveillance footage.

Perry argues that because no witness testified to the technical details of the recording system, such as its functionality, time accuracy, or production methods, and because neither he nor Helms authenticated what was depicted in the footage, his counsel had no legitimate tactical reason in not objecting to its admission. We disagree. The collective testimony about the surveillance footage and screenshots, as described, satisfies ER 901. *State v. Newman*, 4 Wn. App. 588, 593, 484 P.2d 473 (1971). An objection would likely have failed, with counsel's choice to not object aligning with defense tactics to emphasize that other suspects, like Helms, were present at the Redtop. *See State v. Garrett*, 124 Wn.2d 504, 520, 881 P.2d 185 (1994).

However, the State concedes that a screenshot from bodycam footage taken of Helms two days after the murder, exhibit P-111, which was never authenticated because the officer from whom the bodycam footage was obtained was never identified, should not have been admitted into evidence. The State argues that despite the lack of proper authentication, defense counsel's decision to not object to this exhibit was neither deficient nor prejudicial. We agree with both parties that exhibit P-111 was not properly authenticated.

Because exhibit P-111 was not properly authenticated and it resulted in the State presenting evidence that Helms was wearing the same clothing as on the day of the murder, and part of that clothing was collected on June 23 and no blood was found, which was part of why law enforcement ruled Helms out as a suspect, defense counsel's failure to object to this unauthenticated exhibit was deficient. It was not, however, prejudicial, as will be addressed in more detail later in our analysis.

### B.    *Unadmitted surveillance footage*

Perry argues that his counsel should have objected under ER 1002 (best evidence rule) and ER 1004 (admissibility of other evidence of contents) to testimony of Sergeant Jason Hunt and Detective James Hall that Michael Perry characterizes as an improper narration of the contents of unadmitted surveillance footage. Perry claims the failure to

object to this testimony amounted to actually assisting the State prove their case, in that the State was allowed to establish that only Perry could have been in room 115 during the murder.

During Detective Hall's testimony, exhibits consisting of several photographs and video were admitted into evidence, including: (1) screenshots of Michael Perry at the Redtop, (2) screenshots of Christopher Helms at the Redtop, (3) a screenshot of Helms taken two days after the murder from an officer's body camera, and (4) a short video of Perry on bicycle at the Redtop. Following the admission of this evidence, Hall provided an oral summary of all of the footage collected from the Redtop on the day of the murder to give a timeline of the comings and goings of everyone in or near room 115 between 8:00 a.m. and 11:06 a.m., when the last person exited the room prior to discovery of Trendowicz's body.

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at [a] reasonable time and place. The court may order that they be produced in court.

ER 1006.

When original records are too voluminous for easy court use, oral testimony is permitted concerning the records. *State v. Kane*, 23 Wn. App. 107, 110-11, 594 P.2d

1357 (1979) ("[S]o long as the underlying records could have been admitted, it is not error to admit either a compilation of such records or testimony concerning such records, if the proponent establishes that the original records are too voluminous for easy court use."). The summary of the Redtop surveillance footage by Detective Hall conforms to the rules of evidence. Hall testified that he reviewed several hours of footage taken from several different angles. It would not have been an effective use of time at trial to play all of this video footage for the jury. Moreover, by not objecting to the oral summary testified to by Hall, defense counsel was able to argue during closing that the jury should discredit Hall's testimony because he conducted a "lazy investigation."[2] 2 RP (Oct. 31, 2023) at 806. There was no deficient performance by Perry's counsel in not objecting to the testimony summarizing the voluminous video content.

### C.    *Booking photos*

Perry challenges the admission of prior booking photos, exhibit P-122, as implying criminal propensity despite some sanitization of the exhibit. He argues that,

---

[2] The defense theory emphasized the shortcomings of the investigation. Screenshots associated Helms with Trendowicz's room at the Redtop, supporting the argument by Perry that police had ignored other leads. This supports the defense theory that others were present at the time of the murder, which would allow jurors to doubt whether Perry was the one who committed the crime. Introduction by the State of limited excerpts from the surveillance footage rather than full footage aligned with the defense's portrayal of the investigation as being sloppy.

in addition to the booking photo exhibit being unduly prejudicial, it was also unnecessary to prove his identity given photographs taken of him on the day of his arrest were also admitted into evidence.

The State counters that Perry's claim overlooks the pretrial motions, that included the trial court conducting an ER 403 balancing test and ruling that the redacted booking photos were admissible in light of Perry's identity being in dispute. The State argues that any objection to the photographs at trial would have been futile given the pretrial ruling. Further, the State claims that the booking photos plausibly could be perceived as a driver's license, passport, workplace security, or other similar noncriminal form of identification.

In a pretrial motion in limine, the State sought admission of an exhibit containing two photographs taken of Perry when he was booked into jail a few weeks prior to his arrest on the murder charge. Law enforcement had used these photos on June 10 to help establish Perry's identity after seeing the Redtop surveillance footage. The State argued in its pretrial motion that, because there were no stipulations by the parties as to identity, and no defense other than general denial had been proffered, it was entitled to admission of the booking photos under ER 902(d) as a self-authenticating certified copy of a public record. The State claimed the booking sheets that contained the photos had been sanitized

of identifying information and reference to the nature or timing of the prior arrest.

Defense counsel responded that identity was not a major issue in the murder case, given

anticipated testimony identifying Perry. Ultimately, however, defense counsel argued

there was no objection to law enforcement testifying that they reviewed prior

photographs of Perry and the person in the surveillance video appeared to be the same

person, but opposed reference to any photo as being a "booking photograph" as this could

imply prior wrongs or bad acts under ER 404(b). 1 RP (Oct. 23, 2023) at 53-54.

> The trial court granted the State's motion in limine, commenting:

> Given that the [S]tate does have a burden and there is general denial, they are required to prove the issue of identity beyond a reasonable doubt. So it does appear to be more probative than prejudicial given the general denial defense.
> I'm going to allow law enforcement or whoever the [S]tate presents for that particular photograph assuming foundation's laid. We're going to sanitize it by not referring to it as a booking photograph or reference from a photograph of a prior arrest. There's no need to mention that. But law enforcement can consistently testify this is a—a known photograph that they had of him on their records for the purposes of identification under [ER] 902.

1 RP (Oct. 26, 2023) at 54. In its written order, the trial court noted in explanation

that witnesses testifying for the State must refer to any booking photograph as a

"known photograph in their records." Clerk's Papers (CP) at 142. The photographs

and accompanying information as presented in the exhibit at trial appear below:

14



Ex. P-122. Three photographs taken of Perry after his arrest on June 10 were also

admitted into evidence:



Ex. P-19, P-20, P-21; *see also* 1 RP (Oct. 26, 2023) at 426, 484.

"We have previously recognized that referring to booking photos may raise a

prejudicial inference of criminal propensity." *State v. Sanford*, 128 Wn. App. 280, 286,

115 P.3d 368 (2005) (citing *State v. Henderson*, 100 Wn. App. 794, 803, 998 P.2d 907

(2000)). Here, the prejudicial nature of the booking photos is evident: Perry is in a yellow

jumpsuit, with front and side profiles depicted, and the date the photographs were taken is shown, in addition to other information. These booking photos, in combination with the agreement of Sergeant Hunt during his testimony that these pictures of Perry were retrieved from a "database that is commonly available to law enforcement," 1 RP (Oct. 24, 2023) at 103, strongly implies prior criminal involvement. This invites propensity inferences of "other crimes, wrongs, or acts" prohibited by ER 404(b). In addition, the arrest-day photos were sufficient to prove Perry's identity without the need for the introduction of the prior booking photos. The State's suggestion that the photos could resemble a driver's license, passport, or workplace identification is unpersuasive. Such documents rarely include side profiles, and people do not typically wear yellow jumpsuits when having these photos taken. The context that the photos were retrieved by law enforcement from a database further reinforces a criminal connotation. There was no reasonable strategic basis for Perry's counsel to not object to the admission of the booking photos once the alternate photos from the day of Perry's arrest were forthcoming.

Accordingly, we agree with Perry that his defense counsel's performance was deficient on this issue.

D.      *Law enforcement identifications of Michael Perry and*
        *Christopher Helms from surveillance footage*

Michael Perry argues his counsel was deficient in failing to object to Sergeant Hunt and Detective Hall's identification of Perry and Helms on the surveillance footage. He contends this invaded the province of the jury and resulted in an inference that law enforcement was familiar with Perry from prior criminal contacts.

Lay testimony in the form of opinions or inferences is permitted when it is "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness'[s] testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of rule 702." ER 701. "A lay witness may give an opinion concerning the identity of a person depicted in a surveillance photograph if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury." *State v. Hardy*, 76 Wn. App. 188, 190, 884 P.2d 8 (1994), *aff'd sub nom., State v. Clark*, 129 Wn.2d 211, 916 P.2d 384 (1996). However, "[o]pinion testimony identifying individuals in a surveillance photo runs 'the risk of invading the province of the jury and unfairly prejudicing [the defendant].'" *State v. George*, 150 Wn. App. 110, 118, 206 P.3d 697 (2009) (alteration in original) (quoting *United States v. LaPierre,* 998 F.2d 1460, 1465

(9th Cir. 1993) (finding officer's identification testimony did not assist jury because the officer had never seen the defendant in person).

On the day of the murder, Sergeant Hunt ran screenshots taken from the motel video surveillance through a law enforcement database to help identify potential suspects. At the point this was done, the identity of the people depicted in the footage was unknown. Therefore, it was not improper for Sergeant Hunt to testify as to how law enforcement identified Perry as a suspect.

Michael Perry argues that Detective Hall did not have previous contact with him or with Christopher Helms and, therefore, Hall should not have been allowed to testify regarding their identities. Hall was the lead law enforcement investigator in this case. He had sufficient contact with both Perry and Helms such that his identification of them on surveillance footage was appropriate. Hall contacted Perry when Perry was arrested and brought Perry into an interview room where the detective collected evidence, took photographs, and became aware of a stain on the back of Perry's head. Likewise, Hall collected other evidence and interviewed Helms. This claim fails because Hall did have contact with both Perry and Helms sufficient to make an identification of each man.

There was no deficient performance by Michael Perry's counsel in not objecting to Sergeant Hunt and Detective Hall identifying Perry or Helms on the surveillance footage.

E. *Opinion testimony*

Perry identifies five instances in which he claims his counsel was deficient in failing to object to improper opinion testimony by Detective Hall. Opinion testimony is "based on one's belief or idea rather than on direct knowledge of the facts at issue." *State v. Demery*, 144 Wn.2d 753, 760, 30 P.3d 1278 (2001) (plurality opinion). The Washington Supreme Court established factors to consider when determining whether statements are impermissible opinion testimony. "[T]he court will consider the circumstances of the case, including the following factors: '(1) the type of witness involved, (2) the specific nature of the testimony, (3) the nature of the charges, (4) the type of defense, and (5) the other evidence before the trier of fact.'" *State v. Montgomery*, 163 Wn.2d 577, 591, 183 P.3d 267 (2008) (some internal quotation marks omitted) (quoting *Demery*, 144 Wn.2d at 759). Opinion testimony is inappropriate in criminal trials when it expresses personal beliefs about the defendant's guilt, intent, or witness veracity. *Id*.

Detective Hall's testimony here was focused on his role as the lead investigator of John Trendowicz's murder. Michael Perry's defense theory was that law enforcement conducted a lazy investigation and failed to properly rule out other potential suspects. Perry focuses on five statements by Hall that Perry claims inferred his guilt.

First, Michael Perry argues Detective Hall improperly compared Perry's clothing in the surveillance video with items found in the burn pit, surmising Perry destroyed his clothes following the murder. In the context of reviewing a series of photographic exhibits of the burn pit and its contents, and reaching an exhibit consisting of a photo of a button taken from the pit, the following exchange between Hall and counsel for the State occurred:

> A.   Another button, which, as you can see, there's several buttons. Pretty consistent with the jacket.
> Q.   So are the denim pieces that you found as well as the buttons consistent with what Mr. Perry was wearing when he left the Redtop Motel?
> A.   Yes. The denim jacket with the button-up jacket is what it was.

2 RP (Oct. 30, 2023) at 636. This was a direct observation from items collected during the investigation and a review of the surveillance footage. It does not rise to the level of opinion testimony.

Second, Michael Perry contends Detective Hall improperly opined that Perry "wiped the handlebars" of his bike after leaving room 115, based on review of surveillance footage. Appellant's Opening Br. at 28 (citing 2 RP (Oct. 30, 2023) at 648, 650-51; Ex. P-135). Hall described the footage as follows: "So [Perry] steps out of the room, he collects his bike, the orange one, and then it appears as though he's got some kind of cloth that he wipes across the handlebars of the black mountain bike."

20

2 RP (Oct. 30, 2023) at 648. This was a factual observation. The jury viewed the same video during this testimony and was therefore able to make its own independent assessment of what was shown.

Third, Michael Perry asserts Detective Hall compared Christopher Helms's clothing in surveillance video taken from the Redtop, to what was shown in body camera footage taken two days later and what was collected during Hall's interview of Helms on June 23, opining the clothing was the same, and that testing on a t-shirt and rubberized bracelet collected on June 23 determined there was no blood on the clothes. This claim fails as Hall's statement that Helms wore the same clothing in both videos, as well as during his subsequent interview of Helms, is a direct observation supported by admitted evidence.

Fourth, Michael Perry argues that Detective Hall improperly compared Jason Wood's pretrial demeanor and Wood's demeanor when testifying at trial, commenting that Wood seemed "'intimidated'" at trial and had a better recollection of events when interviewed approximately four months prior to trial. Appellant's Opening Br. at 65-66 (quoting 2 RP (Oct. 30, 2023) at 655). Hall's remark that Wood appeared "more closed up" and "seemed real nervous about it now" was an observation offered to explain why Wood's testimony was less detailed at trial than when he was interviewed by law

enforcement prior to trial. 2 RP (Oct. 30, 2023) at 656. These statements do not opine on veracity. Arguably, the statements aide the defense strategy to attack Wood's credibility. The jury already had independent reasons to doubt Wood (e.g. drug use, memory lapses, an immunity from prosecution agreement with the State), with Hall's testimony confirming Wood's testimony at trial was not consistent with information gathered four months prior to trial. The choice by Perry's counsel not to object aligned with a defense strategy that likely included a plan to call another witness, Jason Wood's ex-wife Cassandra Grubb, for impeachment purposes (although that impeachment testimony was later excluded). We defer to tactical decisions made during trial. *See State v. Johnson*, 143 Wn. App. 1, 19, 177 P.3d 1127 (2007) (citing *State v. Madison*, 53 Wn. App. 754, 763, 770 P.2d 662 (1989)). Hall's unsolicited comment that Wood during his pretrial interview was "almost apologetic . . . felt bad for Mr. Trendowicz," 2 RP (Oct. 30, 2023, at 656, was cumulative of a natural reaction to the homicide; any error in allowing the comment was harmless. *See State v. Lord*, 161 Wn.2d 276, 286, 165 P.3d 1251 (2007) ("The jury would understand [trial spectators wearing picture buttons of the murder victim at trial] as a sign of loss, but not automatically find it inherently prejudicial or as urging conviction of [the] defendant.").

22

Fifth, Michael Perry claims Detective Hall's testimony about how law enforcement "'ruled out'" Christopher Helms as a suspect amounted to a comment on Perry's guilt and it should have drawn an objection. Appellant's Opening Br. at 66-67 (citing 2 RP (Oct. 30, 2023) at 661-62, 679-82). On direct examination, Hall testified as to how Helms came to be eliminated as a suspect in the murder, including the lack of physical and DNA evidence, and information obtained from an interview of Helms. During cross-examination, defense counsel challenged Hall as to the thoroughness of that investigation. On redirect, Hall further explained the investigation's progression:

> So we start with the—the most simple, I guess, explanation for the situation and—which is in this case the video. We're going to start with the last people there. So we start with that. And if we can't exclude them, then we move down the line to—and other evidence then would become more valuable. But at this time it just didn't get that far.

2 RP (Oct. 30, 2023) at 679. Detective Hall later confirmed that Michael Perry was the last person seen on the surveillance footage leaving John Trendowicz's room prior to discovery of Trendowicz's body.

This was not testimony opining guilt, but a factual description of investigative steps. Given Perry's defense theory of a "lazy" or "incompetent" investigation that ignored other suspects, and defense counsel's questioning of Hall on this subject during cross-examination, the State was entitled to rebut this theory on redirect by detailing

steps taken and why other suspects were eliminated. *See State v. Avendano-Lopez*,

79 Wn. App. 706, 714, 904 P.2d 324 (1995).

Michael Perry fails to show that Detective Hall's testimony contained improper

opinion testimony. Therefore, counsel's performance was not deficient in choosing not to

object to the testimony.

### F.     DNA evidence

Michael Perry argues his defense counsel was ineffective by failing to object to

the admission of DNA and blood evidence collected after Perry's arrest, and the related

lab results. He claims the State failed to establish a proper chain of custody of this

evidence. Perry contends that his counsel's failure to object allowed the jury to hear

damaging testimony that Trendowicz's DNA was found on the back of Perry's head,

and asserts there was no legitimate strategic reason for his counsel not to object to this

evidence.

The State counters that the trial testimony sufficiently met authentication and

chain of custody requirements. We agree with the State.

As noted previously, once Perry had been arrested on the evening of June 10, he

was placed in an interview room and Detective Hall obtained a search warrant to collect

evidence from Perry. During the collection process, a red stain was noted on the back of

Perry's head and this area was swabbed. Trayce Boniecki, a forensic specialist with the sheriff's office, testified about her role in collecting evidence at the Redtop Motel and later directly from Perry after his arrest. It was Boniecki who swabbed the red stain on the back of Perry's head. Hall testified that he observed this process.

Detective Hall had previously identified exhibit P-164 as the swabs applied by Trayce Boniecki to the back of Michael Perry's head, recognizing the packaging label. 1 RP (Oct. 26, 2023) at 489 ("So Exhibit 164 is labeled 'Swabs from the back head, red stain' it says, 'Michael Perry,' and it is [initialed] . . . by [Trayce Boniecki."). Hall observed Boniecki during the DNA collection and he submitted the swabs to the Washington State Patrol Crime Laboratory (Crime Lab) for processing.

A sample of John Trendowicz's blood was obtained by Dr. Makinzie Mott, a forensic pathologist, during her June 12 autopsy of John Trendowicz. That blood card, exhibit P-165, was admitted during the trial testimony of Michael Drapeau, who was the designated on-call major crimes detective for the sheriff's office on the day that Trendowicz was murdered. Drapeau also attended the autopsy of Trendowicz. Dr. Mott noted during her trial testimony that, at the time of the autopsy, Trendowicz's identity was still in question. She testified that Trendowicz's identity would later be confirmed through fingerprint analysis.

While identifying the blood card exhibit, Detective Drapeau noted that the description of the blood card says "UDM, which means unknown deceased male because [Trendowicz] was unidentified at the time," with the card also being dated "06/10," Drapeau testified that he recognized the evidence because it had a property tag affixed to it, the property bag was sealed with evidence tape, and the bag had his initials and personnel number written on it. 1 RP (Oct. 24, 2023 at 87-88 (citing Ex. P-165). Drapeau testified that he could tell the sample had been sent to the Crime Lab because the evidence envelope had blue tape on it, which would only be present if it had gone to the Crime Lab.

Detective Hall also recognized and identified exhibit P-165 during his trial testimony. He noted Dr. Mott's name and the collection date on the card, and confirmed that he was the person who submitted the blood card to the Crime Lab for DNA profiling and thereafter reviewed the results.

Tyler Staples, a forensic scientist in the DNA section of the Crime Lab, testified to the evidence handling procedures used at the Crime Lab, including receipt of evidence by hand delivery from law enforcement or secure courier, computerized tracking, and vault storage to ensure reliability. Staples confirmed he tested (1) the DNA reference sample from Perry, exhibit P-163, (2) the swabs of the stain on the back of Perry's head,

exhibit P-164, and (3) Trendowicz's blood card, exhibit P-165. Staples identified each exhibit envelope by the packaging which had his initials and the testing date.

Analysis of the head stain swabs by the Crime Lab showed a mixed DNA profile consistent with the samples collected from Michael Perry and John Trendowicz. Assuming two contributors with Perry as one of the contributors, the profile was 4.5 octillion times more likely to be from Perry and Trendowicz than from Perry and a random, unrelated individual.

For physical evidence connected to a crime to be admissible, "'it must be satisfactorily identified and shown to be in substantially the same condition as when the crime was committed.'" *State v. Roche*, 114 Wn. App. 424, 436, 59 P.3d 682 (2002) (quoting *State v. Campbell*, 103 Wn.2d 1, 21, 691 P.2d 929 (1984)). Unique and readily identifiable items can be authenticated through witness testimony. *Roche*, 114 Wn. App. at 436. For fungible evidence susceptible to alteration (e.g., biological samples), a chain of custody must be established "'*with sufficient completeness* to render it *improbable* that the original item has either been exchanged with another or been contaminated or tampered with.'" *Id.* (quoting *United States v. Cardenas*, 864 F.2d 1528, 1531 (10th Cir. 1989). Absolute certainty is not required; minor discrepancies affect weight, not admissibility. *Campbell*, 103 Wn.2d at 21.

Michael Perry's challenge to exhibit P-164 (the head stain swabs) fails. Forensic specialist Boniecki testified to her process of collecting the samples. Detective Hall observed the collection process and submitted the samples to the Crime Lab, identifying them by labels and initials. Staples confirmed lab integrity through secure procedures and markings. This chain renders tampering or alteration improbable, with any minor uncertainties going to weight. *See Campbell*, 103 Wn.2d at 21.

For exhibit P-165 (Trendowicz's blood card), Dr. Mott collected it at the autopsy. Detectives Drapeau and Hall identified the blood card via tags, seals, initials, and dates, with Hall submitting the blood card to the Crime Lab. Staples's analysis linked the blood to Michael Perry's head stain with high probability. The "unknown deceased male" label is a minor discrepancy tied to the timing of the autopsy in relation to positively identifying John Trendowicz. This impacts the weight of the evidence, not its admissibility. *See Roche*, 114 Wn. App. at 436; *Campbell*, 103 Wn.2d at 21.[3]

---

[3] The absence of John Trendowicz's name on exhibit P-165 does not break the chain of custody. Witnesses' direct knowledge of collection and submission authenticates it. Any doubts about whether the blood was indeed from Trendowicz are concerns to be weighed by the trier of fact.

28

Because the State properly authenticated these exhibits, an objection would have been futile. The lack of objection by defense counsel was not deficient performance. *See Strickland*, 466 U.S. at 687; *Kyllo*, 166 Wn.2d at 862.

*1.2 Prejudice*

Despite deficiencies in Michael Perry's counsel not objecting to the admission of: (1) a screenshot of Christopher Helms that was derived from an unidentified law enforcement officer's body camera, exhibit P-111, and (2) Perry's prior booking photos, exhibit P-122, Perry has not demonstrated prejudice. Prejudice in the context of an ineffective assistance of counsel claim occurs when the deficiencies are "'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Hendrickson*, 129 Wn.2d at 78 (quoting *Strickland*, 466 U.S. at 687). A showing of prejudice is made when "there is a reasonable probability that, but for counsel's errors, the result of trial would have been different." *Id*.

Because there was other significant admissible evidence supporting the jury's verdict, we see no reasonable probability that the outcome of Perry's trial would have been different if counsel had successfully objected to the admission of these two exhibits. As previously stated, Redtop resident Terry Grimm overheard an intense argument between Michael Perry and John Trendowicz that occurred on June 10, 2023, around

10:30 a.m., evidence that Trendowicz was alive at that time. The surveillance evidence

supported that the only person in room 115 with Trendowicz between 10:30 a.m. and the

discovery of Trendowicz's body was Perry. Later that day, Michael Scalera observed

Perry burning clothing along the Spokane River, not far from the Redtop. Detective Hall

testified that the remnants of clothing recovered from the burn pit the day after the

murder was consistent with what Perry was wearing when he left the Redtop the day

before. Additionally, there was a mixture of DNA from both Perry had Trendowicz in the

red stain discovered on the back of Perry's head after his arrest on the day of the murder.

Given this and other evidence, there is a reasonable probability that Perry would have

been found guilty despite the admission of exhibits P-111 and P-122. While Perry's claim

of ineffective assistance of counsel survives the deficiency prong of the *Strickland* test,

it fails on the prejudice prong.

## 2. RIGHT TO PRESENT A DEFENSE

Perry argues that the exclusion of Cassandra Grubb's testimony, proffered to

impeach prosecution witness Jason Wood, violated his rights under the Sixth Amendment

to the United States Constitution and article I, section 22 of the Washington Constitution.

A criminal defendant has a constitutional right to present a defense, but this right

is not absolute and does not extend to irrelevant or inadmissible evidence. *State v. Jones,*

168 Wn.2d 713, 720, 230 P.3d 576 (2010). We review evidentiary rulings for abuse of discretion and conduct a de novo review on the legal question of whether those rulings deprived a defendant of the right to present a defense. *State v. Arndt*, 194 Wn.2d 784, 797-98, 453 P.3d 696 (2019) (citing *State v. Clark*, 187 Wn.2d 641, 648-56, 389 P.3d 462 (2017)). To assess a constitutional violation, we consider whether the excluded evidence formed the defendant's entire defense, and "'the State's interest in excluding [the] evidence must be balanced against the defendant's need for the information sought to be admitted.'" *State v. Restvedt*, 26 Wn. App. 2d 102, 123, 527 P.3d 171 (2023) (quoting *Arndt*, 194 Wn.2d at 812).

*2.1 Background on Cassandra Grubb's proffered testimony*

At trial, the State called during its case-in-chief Jason Wood, who testified under an immunity from prosecution agreement. Wood testified he was friends with both John Trendowicz and Michael Perry. When asked if he remembered telling Detective Hall that Perry wanted Trendowicz's money, Wood answered, "I think so." 1 RP (Oct. 24, 2023) at 397. Wood testified that Trendowicz was alive when he last left the motel room on the day of the murder.

On cross-examination, Wood admitted that he was on drugs the day of the murder, which affected his memory, and that he disappeared for a few days after. When asked

where he went after leaving the motel room, Wood first said he went to a shelter but then

said he went "back in the woods, I think . . . ." 1 RP (Oct. 24, 2023) at 399. When asked

if he disappeared for several days after the murder, Wood answered, "I was like drugged

up or something. I like woke up and I—I was in the hospital." 1 RP (Oct. 24, 2023) at

400. Perry's counsel asked Wood if he recalled making a statement to his ex-wife,

Cassandra Grubb:

> A. Okay. You were asked if you had seen Mr. Trendowicz dead and you
> said no, right?
> A. Yeah.
> Q. Did you call Ms. Grubb and tell her you can't unsee what you saw and
> that you can't get those images out of your head?
> A. No.
> Q. You never told her that?
> A. No.
> Q. You had mentioned to[the prosecutor] at one point that—and you've
> testified that your memory's not great right now, but you also mentioned it
> wasn't great when you were interviewed by law enforcement; is that right?
> A. That's right.

1 RP (Oct. 24, 2023) at 403. Perry's counsel then ended his cross-examination and the

State proceeded with a redirect examination of Wood.

Just prior to the State resting its case, during a discussion on the remaining trial

schedule, defense counsel indicated that it would be calling Cassandra Grubb to testify.

The State and the court were told that the purpose of this testimony would be to impeach

Jason Wood, specifically to contradict Wood's denial during cross-examination that he

32

had told Grubb he could not "unsee what [he] saw" on the day of the murder and was unable to "get those images out of [his] head," 1 RP (Oct. 24, 2023) at 403, with the clear implication being that John Trendowicz was already dead when Wood left room 115. The State objected, arguing insufficient foundation and a risk of misleading the jury. The State noted that in Grubb's prior police interview, she said Wood told her, "'I can't get the images out of my head,'" but she did not specify that Wood said "he couldn't unsee things he had seen." 2 RP (Oct. 30, 2023) at 689. The State additionally argued Grubb expressed uncertainty about whether Wood entered the room after Trendowicz's death or if he was just told about the murder.

The trial court determined that, with Cassandra Grubb already waiting in the hallway outside the courtroom, it would allow Michael Perry to make an offer of proof of Grubb's anticipated testimony, outside the jury's presence, prior to the court making a ruling on the State's objection.

Grubb testified under direct examination by Perry's counsel to the following:

[A.]So [Wood] said when he returned back to the motel is when he walked in and that's where he had seen the victim. Off the top of my head, I didn't know much more about this, until the other day, of names or anything, that, um—he will never get the memory or the visions out of his head and that he wanted to commit suicide because he was so traumatized.
Q.  So he told you on that phone call when he came back into the room, he saw a body?
A.  Yeah.

33

Q. Did he tell you if the body—
A. Stabbed to death with water running and blood everywhere.
Q. In the bathtub?
A. Yeah.
Q. Okay. He told you he had seen that?
A. Yes.
Q. And then he followed that up with he cannot get the images out of his head, correct?
A. Correct.

2 RP (Oct. 30, 2023) at 695-96. Grubb was then cross-examined by the State:

Q. Ms. Grubb, do you remember talking to officers shortly after your conversation?
A. Yeah.
Q. Do you remember talking to me just outside—
A. Yeah.
Q. —here?
And I asked you, you don't know for sure whether or not Mr. Wood saw this or somebody else told him about what had happened; isn't that correct?
A. To my recollection, knowing my—well, ex-husband now, by his voice and his—just knowing him emotionally, that he witnessed or not witnessed the crime, but he saw [the aftermath] and then didn't know what to do.
Q. Do you remember when you talked to the detective if they asked you if Jason, Mr. Wood, said he went in, you said, "*I don't know if he went in there or someone told him he was in there.* It was hard to make it out. I was in such a state of shock, I was really struggling to put it all together." Do you remember saying something along those lines?
A. Yeah. *But by the tone of his voice—*
Q. I'm sorry, Ms. Grubb, just from my question.
So as far as whether or not he saw it, it's something you're—it's your guess at it based on—knowing him, so based on his tone[.]
. . . .
Q. Mr. Wood never told you he went in and saw that; that is your guess based on how he was speaking; is that correct?

A.   Well, when you state that you can never get that visitation out of your head, then that's a clear—pretty clear indication that he saw it himself, because why else would he say that?

Q.   If someone described to Mr. Wood what they had seen inside the bathroom and he felt responsible for what happened, is that also possible that would put an image in his head? He can imagine, can he, Mr. Wood? He's got an imagination?

A.   I—I cannot actually answer that completely clearly because I was not there. *All I know is from his tone of voice that he was in the surrounding area and was present and invited the person that actually committed the crime into the place where he was working to earn fentanyl and that he said he didn't understand because the only thing of value that that old man— sorry to say it like that—had in that room was no more than $300 of value.* So why it was taken to the extremes that it was almost unremarkable to him that this took place.

. . . .

Q.   Again, Mr. Wood never directly said to you, "I walked into that room and saw this"?

A.   I don't know how you directly—un-directly say that. When he says, "I'll never get the image out of my head," only makes me, as a human, relate that he actually did see it. And I don't know how I'm supposed to change what the answer you're looking for is. I'm just telling you what I know and what I was told.

2 RP (Oct. 30, 2023) at 696-99 (emphasis added).

On redirect by Perry's counsel, Grubb stated that Wood told her that he saw Trendowicz in the bathroom, stabbed, with water running, and blood everywhere and that Wood did not know what to do.

## 2.2   Trial court's ruling

After hearing further argument from counsel and reviewing on the record the

testimony at issue by Jason Woods, the trial court ruled:

> THE COURT: The court is in agreement—based on the phraseology of the question, I don't believe a proper basis to bring this in exists. And I do think—when I—when I look at the reason that it's being brought in, it—I understand the defense is maintaining the position it's for impeachment, to impeach Mr. Woods's credibility. But it really does seem that the primary reason to bring this in is to—without acknowledging that they're trying to establish other suspect evidence, that appears to be the—the primary purpose of that. It is being offered for the truth of the matter asserted rather than the primary purpose of impeaching the witness on this case, who overall gave—you know, consistently indicated he couldn't remember, couldn't remember.
> So the probative value for impeachment purposes is—is incredibly low. The probative—the prejudicial effect is incredibly high because there's a wide risk of confusion on this issue, especially given the phraseology of the questioning where it can be answered no even if part of the answer is yes because of the combination of two subjects—subjects in the questioning on cross. I don't find that the foundation for this impeachment has been laid.
> I also recall that Mr. Wood was subject to recall. And I think additional foundation before Ms. Grubb's testimony on these issues—unless there's other reasons you're calling her, but just based on the offer of proof I heard, I find that the prejudicial effect outweighs the probative value. I also find that there's not a proper basis for impeachment based on the questions that were asked on cross. And additional foundation would need to be laid through Mr. Wood before the court would find the probative value of the impeachment meets the threshold for admissibility.

2 RP (Oct. 30, 2023) at 709-10. After briefly moving into other matters, the trial court

noted:

[THE COURT:] Counsels, I'm going to supplement the record just a bit on my last ruling. The court also was considering in finding that—weighing the probative value, it appears to the court also that the assumption made by the witness that it's—that, you know, based on her opinion, gauging the tone of the—Mr. Wood's voice, that he had been—observed is more probably than not—not true. At least in my understanding of the evidence, and feel free to challenge this, but it's more probable than not that he didn't see.

It appears that we've had testimony in the case that there's been video surveillance, at least to the front section, even the portion that would be off-camera, there was testimony by Detective Hall that there would have been some visual. The only exception to that being the two-story window that's 8 inches wide would not have had camera coverage. So it's a question of is it—is it more likely true that her assumption is correct based on the evidence presented in court.

That's another additional reason why this—the court was concerned this would be more prejudicial than probative and that it was being primarily offered not for the impeachment probative value but for the truth of the matter asserted probative value. That was part of the court's calculus as well, in addition to what I stated before. The court feels this is highly prejudicial, as it will lead to confusion.

2 RP (Oct. 30, 2023) at 711-12. Perry's counsel then pointed out that the surveillance footage would not address this issue as it only showed what happened on June 10 between 8:00 a.m. and 2:00 p.m. Jason Wood had testified he left room 115 in the early morning hours of June 10, and there was testimony that John Trendowicz was visually seen alive on June 9 around 5:00 p.m. Perry's counsel confirmed for the court that there is no surveillance footage of Wood coming or going from the Redtop. The trial court then further commented:

THE COURT: Okay. All right. So, okay, I—I see your point there.

All right. All right. Well, even still, even with that gap, I still find that I'm persuaded by the state's position that it's more confusing and it is being primarily offered for the truth of the matter asserted, not for impeachment purposes, taking account for the overall testimony of Mr. Wood. He indicated he just didn't have good memory on most of these questions, making impeachment less probative.

And the way the question was phrased, I would need additional foundation from Mr. Wood to feel comfortable this was proper impeachment given the combination of subjects and the questions that were asked of him. Defense is welcome to recall Mr. Wood.

2 RP (Oct. 30, 2023) at 713. Wood was not recalled to testify.

## 2.3   Analysis

Michael Perry contends Cassandra Grubb's testimony was highly relevant because it went to who was in room 115 around the time of the murder and would raise a doubt as to the State's theory that Perry was the only person present in the room when John Trendowicz was killed. He cites to a jury question made during deliberations that asked: "Are [] Helms and [] Perry the only two people to come and go from room 115 from 8am to 1315 on June 10th, 2023, per the video surveillance? If not, who else did?" CP at 209. After first giving counsel the opportunity to be heard, the trial court directed the jury to refer to the testimony, exhibits, and the court's instructions. The trial court noted during a discussion of the jury's question with counsel that there was no request by the jury to watch the video surveillance footage.

38

Michael Perry's argument in support of allowing testimony from Cassandra Grubb underscores the trial court's concern: Perry sought the testimony for substantive proof of the presence of others in room 115, not merely for impeachment of Jason Wood. The trial court did not abuse its discretion when it excluded Grubb's testimony. To impeach a witness by a prior inconsistent statement, the prior statement must directly contradict the trial testimony. *State v. Newbern*, 95 Wn. App. 277, 292, 294, 975 P.2d 1041 (1999). Here, Wood's denial on cross-examination did not squarely contradict Grubb's account due to the compound question asked and the speculative elements within Grubb's proffered testimony.

Under ER 403, "relevant[] evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Grubb's admissions of uncertainty and reliance on Wood's "tone of voice," 2 RP (Oct. 30, 2023) at 698, renders her testimony speculative and confusing, with a high risk that the jury would confuse it with substantive evidence implicating Wood or another suspect. The probative value was minimal, particularly given Wood's acknowledged memory issues, which Perry's counsel effectively highlighted on cross-examination. As noted by the trial court, the primary aim of offering Grubb's testimony appeared to be a desire to introduce other suspect evidence. This is in the context of the

surveillance video that reduced the likelihood of Wood reentering room 115 after the

murder, which heightens the risk of confusion.

The exclusion of Grubb's proffered impeachment testimony did not violate Perry's

right to present a defense, as the testimony was not his entire defense. Wood was cross-

examined extensively about his drug use, memory lapses, and whereabouts both before

and after the murder. Perry also argued alternative theories through other evidence.

The State's interest in excluding speculative and misleading testimony outweighed

Perry's need for the admission of this particular proffered evidence. *See Restvedt*,

26 Wn. App. 2d at 123. Accordingly, the trial court did not err in excluding the proffered

impeachment testimony of Cassandra Grubb.

## STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW

In a RAP 10.10 statement of additional grounds for review, Perry raises three

additional claims: (1) a speedy trial violation, (2) a violation of *Miranda* rights, and

(3) a claim that the State violated an order on its own motion in limine. We do not find

merit in any of the asserted claims.

First, Perry alleges a violation of his speedy trial rights under CrR 3.3. The rule

mandates that an in-custody defendant be brought to trial within 60 days of the

commencement date. CrR 3.3(b)(1)(i). The initial commencement date is the defendant's

arraignment. CrR 3.3(c)(1) (citing CrR 4.1). But, this "is not absolute because a trial

court may continue a criminal trial 'when required in the administration of justice and

the defendant will not be substantially prejudiced in the presentation of the defense.'"

*State v. Woods*, 143 Wn.2d 561, 579, 23 P.3d 1046 (2001) (quoting former CrR 3.3(h)

(2000)[4]). A continuance granted under the superior court criminal rules is "'excluded

in computing the time for arraignment and the time for trial.'" *Id.* (quoting former

CrR 3.3(g)(3)). "On appeal, a trial court's grant or denial of a motion for continuance will

not be disturbed absent a showing of manifest abuse of discretion." *Campbell*, 103 Wn.2d

at 14 (citing *State v. Miles*, 77 Wn.2d 593, 597-98, 464 P.2d 723 (1970)).

The State here moved to continue trial on two separate occasions. The reason

given for the first motion was because the prosecutor had a conflict with another trial

scheduled for the same date. The trial court granted the State's motion and moved the

trial date from August 21, 2023, to September 11, 2023. The reason given for the second

motion related to the prosecutor experiencing a personal emergency that required them

to be out of the office with no determined return date established. The trial court also

granted this motion and moved the trial date from September 11 to October 25, 2023.

---

[4] These provisions, related to continuances, have since been moved to CrR 3.3(f).

In both motions, the State provided legitimate reasons for why Perry's trial date needed to be moved. Both motions were consistent with CrR 3.3(f), which allows a party to request a continuance. Since the trial court ruled in favor of the continuances, these periods are excluded in the computation for the time from arraignment to trial. CrR 3.3(e)(3) (citing CrR 3.3(f)). Perry has not demonstrated any prejudice from the trial continuances. The trial court did not abuse its discretion in granting motions.

Second, Michael Perry claims that the arresting officer admitted that they failed give a *Miranda* warning. At a CrR 3.5 hearing held at the beginning of trial, Detective Hall confirmed that at the time he arrested Perry and put him in his patrol car, and he read Perry his *Miranda* rights from a preprinted card. According to Hall, Perry did not indicate that he was waiving his *Miranda* rights. Perry confirmed his identity, including his date of birth. Hall then told Perry he wanted to speak to him about what happened at the Redtop that day. Hall quoted from his report and said that Perry replied, "'I didn't rob that fucking place, man.'" 1 RP (Oct. 23, 2023) at 241. Hall informed Perry that he was investigating a murder at the Redtop and that Perry was seen on surveillance video leaving the victim's room. Hall asked several other questions that Perry declined to answer before Perry said, "'Yeah, I'm not—I want a lawyer,'" and Hall then stopped asking questions. Perry exercised his right to not testify at the CrR 3.5 hearing. The trial

42

court ruled that Perry was in custody at the time Hall told Perry that he wanted to discuss what happened at the Redtop. The court ruled that Perry's statements identifying himself would be allowed. The trial court found Perry's statements to be voluntary and not subject to coercion, but because Perry never made an affirmative acknowledgment that he was waiving his *Miranda* rights, all other statements should not come in during the State's case-in-chief, but could come in for impeachment or rebuttal purposes. We find no error in the trial court's ruling. The court adequately protected Perry's constitutional rights.

Third, Michael Perry contends the State violated an order on its own motion in limine to exclude witnesses from the courtroom by permitting Deputy Christopher Harris to briefly enter the courtroom during Michael Scalera's testimony. In a motion in limine, the State requested all witnesses be excluded from the courtroom, except for Detective Hall, who was the State's designated representative at trial. ER 615. With no objection, the trial court granted this motion. Deputy Harris did enter the courtroom during Michael Scalera's testimony, which was a violation of the trial court's in limine ruling. The trial court addressed the inadvertent intrusion with the parties, and found no prejudice occurred due to the occurrence's brevity and irrelevance to Deputy Harris's testimony. Perry did not object to the trial court's ruling.

"'The purpose of a motion in limine is to dispose of legal matters so counsel will not be forced to make comments in the presence of the jury which might prejudice [their] presentation.'" *State v. Sullivan*, 69 Wn. App. 167, 170, 847 P.2d 953 (1993) (quoting *State v. Kelly,* 102 Wn.2d 188, 193, 685 P.2d 564 (1984)). For Michael Perry to succeed on this issue, he must show that the violation of the order excluding witnesses from the courtroom was a "deliberate disregard of the trial court's ruling or that an objection by itself would be so damaging as to be immune from any admonition or curative instruction by the trial court." *Sullivan*, 69 Wn. App. at 173. Perry interposed no objection, waiving the issues absent exceptional circumstances rendering objection futile. *See id.* No such circumstances appear here.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Murphy, J.

I CONCUR:

_____
Lawrence-Berrey, J.

44

No. 40122-7-III

FEARING, J.P.T.[†] (concurring/dissenting) — Based on the lack of prejudice resulting from any trial error, I concur in the majority's affirmation of the conviction of Michael Perry for second degree murder. I, however, disagree with some of the majority's rulings. I also arrive at some of the majority's rulings from a different direction.

This appeal, more than others, demands a granular review of the record, particularly the specific wording of questions asked by counsel to witnesses and the precise language employed by witnesses when answering. I will quote many of those questions and answers.

*Booking Photographs*

I agree with the majority that defense trial counsel performed ineffectively when failing to object to the introduction of booking photos and the showing of the photos to the jury. I also agree with the majority that this deficiency, at least by itself, did not cause Michael Perry prejudice.

*Evidence of Investigation*

Michael Perry objects that the State elicited inadmissible and prejudicial testimony when law enforcement officers testified about its investigation into the death of John Trendowicz. Perry particularly complains about Detective James Hall avowing at trial

---

[†] George B. Fearing, a retired judge of the Washington State Court of Appeals, is serving as a judge pro tempore of this court pursuant to RCW 2.06.150(1).

that he ruled out other potential suspects. Perry asserts that this testimony implied an opinion that Perry committed the crime.

The majority writes that a law enforcement officer may explain the progression of his or her investigation and how police arrived at the defendant as the lead suspect. I agree the State, in Michael Perry's prosecution, could do so, but write separately to emphasize that the default rule does not permit introduction of such evidence.

Generally, the law enforcement investigation lacks relevance in a criminal trial since the steps taken in the investigation do not render more likely the guilt or innocence of the accused. *State v. Edwards*, 131 Wn. App. 611, 128 P.3d 631 (2006); *State v. Johnson*, 61 Wn. App. 539, 811 P.2d 687 (1991); *State v. Aaron*, 57 Wn. App. 277, 787 P.2d 949 (1990). Nevertheless, when the defense attacks the competency of the investigation, law enforcement's inquiry looms important, and the State may introduce evidence of steps performed by offices, including the ruling out of other suspects.

Because of the strength of the State's evidence against Michael Perry, trial defense counsel astutely attacked the adequacy of the law enforcement investigation into John Trendowicz's murder. The cross-examination of prosecution witnesses and counsel's summation confirms the theme of an incompetent investigation. Perry emphasized to the jury that Detective James Hall, who led the murder investigation, and other officers, viewed the surveillance videos and saw that Perry was the last person to leave Trendowicz's room at the Redtop Motel. Based on this evidence alone, according to Perry, law enforcement erroneously concluded that Perry killed Trendowicz.

2

Several men entered and exited John Trendowicz's hotel room during the twenty-four hours preceding Trendowicz's death. According to Michael Perry, law enforcement overlooked reasonable steps to determine if other possible suspects, such as Scott, with an unknown last name, Christopher Helms, Jason Wood, or a fourth unidentified male perpetrated the homicide. For example, the State failed to collect surveillance videos for the time preceding 8:00 a.m. on June 10, 2023. The State did not collect fingerprints or body prints at Trendowicz's room. According to Perry, law enforcement took measures to only support its theory of Perry as the killer. Thus, Perry's defense widely opened the entryway to testimony of the law enforcement investigation, including the rejection of others as a suspect.

### Detective Hall's Description of Jason Wood as a Witness and His Relating Wood's Sympathy for John Trendowicz

I agree with the majority that Detective James Hall could testify to James Wood's maintaining a good memory during his police interview. Assuming the majority rules that Detective Hall could testify to Wood's sympathy for Trendowicz, I disagree with any such ruling. I also disagree with the majority's imprimatur of Detective Hall's testimony that Wood appeared nervous and intimidated when testifying at trial.

Detective James Hall testified to the following under questioning by the prosecutor:

> Q. Did you speak to Jason Wood?
> A. Yes, also Jason Wood.
> Q. When did you interview him?
> A. Jason Wood was June 21st.
> Q. Okay. Of 2023?

3

Q. Of 2023, yes.

Q. When you interviewed Mr. Wood, what was his demeanor?

A. He was very cooperative, *almost apologetic for what had happened there as far as he felt bad for Mr. Trendowicz.*

Q. Detective Hall, you had a chance to watch Mr. Wood testify [during trial]. Did his demeanor appear different to you?

A. Yeah, definitely.

Q. What was different about it?

A. Ah, he was more closed up about the situation and just seemed real nervous about it now, intimidated, I guess.

Q. How was Mr. Wood's memory when he spoke to you?

A. Ah, the first time very good, yeah. He remembered everything.

2 Report of Proceedings (RP) (Oct. 30, 2023) at 655-56 (emphasis added).

This excerpt from trial testimony shows that Detective James Hall initially testified to the quality of his interview of Jason Wood from eleven days after the homicide. Similarly, the prosecutor asked Hall as to Wood's demeanor during the interview. The response given by Detective James Hall about Jason Wood being cooperative suggests that Hall, when assessing Wood, relied primarily on the manner in which Wood answered questions. Thus, the question and response were allowable.

When responding to the prosecutor's question about Jason Wood's demeanor during the police interview, Detective James Hall added that Wood seemed sympathetic toward John Trendowicz. This response went beyond the scope of the question. More importantly, nothing in Hall's answer suggested that Hall relied on movements or behavior of Wood to draw a conclusion of sympathy, so the testimony relied on comments made by Wood. The testimony was impermissible as hearsay. ER 801, 802.

The prosecutor later queried Detective Hall about Jason Wood's memory during the first interview. I agree this question was permissible. Hall would have based his

answer not on the content or truthfulness of Wood's response, but the extent of the details provided by Wood.

In addition to Detective James Hall's testimony of Jason Wood being sympathetic to the plight of John Trendowicz, trial defense counsel should have objected to Detective Hall testifying to the demeanor and purported state of mind of Jason Wood when Wood testified at trial. Hall averred that Wood appeared nervous and intimidated at trial. The State posed its question only for the purpose of Hall opining as to the credibility of Wood as a trial witness. The question also led to Hall claiming to be able to read Wood's mind.

Generally, no witness may offer testimony in the form of an opinion regarding the veracity of the defendant. Such testimony unfairly prejudices the defendant because it invades the exclusive province of the jury. *State v. Kirkman*, 159 Wn.2d 918, 927, 155 P.3d 125 (2007). Improper opinion testimony from a police officer raises additional concerns because an officer's testimony often carries a special aura of reliability. *State v. Kirkman*, 159 Wn.2d 918, 928-29 (2007).

A lay jury, relying on common experience and without the aid of an expert, is capable of deciding a defendant's state of mind. *State v. Farr-Lenzini*, 93 Wn. App. 453, 459-60, 970 P.2d 313 (1999). Being impacted by fear or intimidation encompasses a witness' state of mind in addition to his or her credibility.

Because Michael Perry failed to object to Detective James Hall's testimony at trial, this court does not directly address the admissibility of the opinion testimony. We address the error in the context of ineffective assistance of counsel. Perry bears

5

a higher burden of proof when claiming ineffective assistance. He must, in addition to establishing evidentiary error, show that his counsel performed negligently when failing to object and the deficient performance prejudiced him. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995).

In response to Michael Perry's contention this his trial counsel performed deficiently by failing to object to two areas of Detective James Hall's testimony, the State asserts the standard argument that evidentiary objections particularly entail trial strategy and Michael Perry's counsel may not have objected so as to not draw attention to the evidence. This standard assertion must be criticized. As a frequent trial judge, I have not observed jurors to base a decision of guilt or innocence on evidentiary objections. The trial judge instructs the jury to ignore objections from counsel when deliberating. In other circumstances, the State argues and this court applies the rule that we assume juries follow all instructions given. *State v. Lord*, 117 Wn.2d 829, 861, 822 P.2d 177 (1991), *abrogated on other grounds by State v. Shierman*, 192 Wn.2d 577, 438 P.3d 1063 (2018). Ignoring this rule in the context of ineffective assistance of counsel shows that courts sometimes apply a rule to affirm a conviction, but disregard the rule when it interferes with a conviction.

The majority writes that defense counsel may not have objected to Detective James Hall's testimony because counsel intended to call Cassandra Grubb to impeach Jason Wood's testimony. Assuming defense counsel was motivated by such a consideration, I disagree to the reasonableness of the strategy. Declining to impeach

6

a prosecution's key witness through one witness because of the possibility of impeaching the witness through another witness makes no sense, particularly when one cannot be assured of the alternative impeaching.

The majority writes that James Wood, being nervous and intimidated, would have aided Michael Perry's defense because this condition impacted his credibility. Therefore, according to the majority, Detective James Hall's testimony about Wood's trial appearance demeanor should be excused by this court. Yet, the State typically only introduces helpful testimony. The State questioned Detective James Hall about Jason Wood's behavior at trial because the answer assisted the prosecution. The evidence bolstered the reliability of Wood's disclosures to Hall during the initial interview, which disclosures harmed Perry.

*Cassandra Grubb Testimony*

Michael Perry assigns error to the trial court's exclusion of Cassandra Grubb's testimony concerning remarks uttered to her by Jason Wood within days of the murder. Grubb is the former wife of Wood. Perry asserts a denial of his constitutional right to present a defense, but not evidentiary error.

During the cross-examination of Jason Wood by Michael Perry's counsel, Wood declared:

> Q. Okay. Who's Cassandra Grubb (phonetic)?
> A. It's my ex-wife.
> Q. Okay. You were asked if you had seen Mr. Trendowicz dead and you said no, right?
> A. Yeah.

Q.  Did you call Ms. Grubb and tell her you can't unsee what you saw and that you can't get those images out of your head?
A.  No.
Q.  You never told her that?
A.  No.
Q.  You had mentioned to [the prosecuting attorney] at one point that—and you've testified that your memory's not great right now, but you also mentioned it wasn't great when you were interviewed by law enforcement; is that right?
A.  That's right.

1 RP (Oct. 25, 2023) at 403.

The trial court precluded testimony of Cassandra Grubb that would contradict Jason Wood's denial of telling her of being unable to remove the scene of the murder from his mind.  Before excluding Grubb's testimony, however, the court permitted Michael Perry to present an offer of proof.  During the offer, counsel for both Perry and the State questioned Grubb.

Cassandra Grubb avowed, during questioning from trial defense counsel:

Q.  Okay.  On June 12th [2023] or shortly thereafter, did you speak to Mr. Wood?
A.  Yeah, he called me frantically.  Like I could not—I could not understand him at first.  And so I had my dad and my stepmom, have my daughters go into the main house so that I could gather information of what he was so frantic about.  And—
Q.  At some point—let me just interject a little bit.  At some point were you able to understand him better?
A.  Yeah.
Q.  Okay.  So he calmed down enough for you to hear?
A.  (Moved head up and down.)
Q.  While you were speaking to him in that conversation, did he tell you that he went to the store to get a soda or something?
A.  Yeah.  He said that he had brought somebody from—well, what I considered—I called it personally like the little heroin—what I considered, which I called it because I don't do drugs myself.  So he had made that choice and that was hence the reason [for] our divorce.

8

So, um, he said that he had left the river where he was staying and he had brought a friend with him that he thought was trustworthy to help the victim, obviously in this case, um, and he didn't think that he was a bad person or anything. And then Jason had left to go get a soda, which didn't surprise me because *he drinks Mountain Dew like crazy.*

So he said when he returned back to the motel is when he walked in and that's where he had seen the victim. Off the top of my head, I didn't know much more about this, until the other day, of names or anything, that, um—he will never get the memory or the visions out of his head and that he wanted to commit suicide because he was so traumatized.

Q. So he told you on that phone call when he came back into the room, he saw a body?

A. Yeah.

Q. Did he tell you if the body—

A. Stabbed to death with water running and blood everywhere.

Q. In the bathtub?

A. Yeah.

Q. Okay. He told you he had seen that?

A. Yes.

Q. And then he followed that up with he cannot get the images out of his head, correct?

A. Correct.

2 RP (Oct. 30, 2023) at 694-96 (emphasis added).

During questioning by the prosecuting attorney, Cassandra Grubb declared:

Q. Ms. Grubb, do you remember talking to officers shortly after your conversation?

A. Yeah.

Q. Do you remember talking to me just outside—

A. Yeah.

Q. —here?

And I asked you, you don't know for sure whether or not Mr. Wood saw this or somebody else told him about what had happened; isn't that correct?

A. To my recollection, knowing my—well, ex -husband now, by his voice and his—just knowing him emotionally, that he witnessed—or not witnessed the crime, but he saw [the aftermath] and then didn't know what to do.

Q. Do you remember when you talked to the detective if they asked you if Jason, Mr. Wood, said he went in, you said, "I don't know if he went

9

in there or someone told him he was in there.  It was hard to make it out.  I was in such a state of shock, I was really struggling to put it all together."  Do you remember saying something along those lines?

A.  Yeah.  But by the tone of his voice—

Q.  I'm sorry, Ms. Grubb, just from my question.

So as far as whether or not he saw it, it's something you're—it's your guess at it based on—knowing him, so based on his tone—

A.  This is what he—

THE COURT REPORTER: I'm sorry, can you wait till he finishes his question?

[DEFENSE COUNSEL]: Your Honor, I would object.

THE COURT: Hold on.  I'll hear the objection.

[DEFENSE COUNSEL]: It doesn't matter what she knows.  The question is what Mr. Wood told her, and Mr. Wood told her he went in and saw the body.  Whether she knows that or not is not the impeachment question.  It's just what Mr. Wood told her.

THE WITNESS: Thank you.

THE COURT: Let me—

[PROSECUTOR]: Are we going to argue that now—

THE COURT: No. I'm going to allow you to finish your question, but—you may proceed with your question.

Q [by PROSECUTOR]. Mr. Wood never told you he went in and saw that; that is your guess based on how he was speaking; is that correct?

A.  Well, when you state that you can never get that visitation out of your head, then that's a clear—pretty clear indication that he saw it himself, because why else would he say that?

Q.  If someone described to Mr. Wood what they had seen inside the bathroom and he felt responsible for what happened, is that also possible that would put an image in his head?  He can imagine, can he, Mr. Wood?  He's got an imagination?

A.  I—I cannot actually answer that completely clearly because I was not there.  All I know is from his tone of voice that he was in the surrounding area and was present and invited the person that actually committed the crime into the place where he was working to earn fentanyl and that he said he didn't understand because the only thing of value that that old man—sorry to say it like that—had in that room was no more than $300 of value.  So why it was taken to the extremes that it was almost unremarkable to him that this took place.

Q.  And you have a no-contact order with Mr. Wood?

A.  Yes.

Q.  And you have a long history with Mr. Wood, do you not?

A.  Yep.

10

Q. And you—it's not always been pleasant between you and Mr. Wood; is that correct?

A. No.

(DISCUSSION OFF THE RECORD AT PROSECUION'S TABLE)

A. The no-contact order is based until 2050 between me and my children.

[PROSECUTOR]: I'm sorry.

(DISCUSSION OFF THE RECORD AT PROSECUION'S TABLE)

Q. Again, Mr. Wood never directly said to you, "I walked into that room and saw this?"

A. I don't know how you directly—un-directly say that. When he says, "I'll never get the image out of my head," only makes me, as a human, relate that he actually did see it. And I don't know how I'm supposed to change what the answer you're looking for is. I'm just telling you what I know and what I told.

2 RP (Oct. 30, 2023) at 696-99.

During further questioning by Michael Perry's counsel, Cassandra Grubb declared:

Q. When I asked you on direct, and you indicated [Jason Wood] went to the store and got a soda, when he came back in he saw the gentleman in the bathtub stabbed?

A. Yes.

Q. Okay.

A. And water was running everywhere and there was blood everywhere and he didn't know what to do.

Q. I just wanted to clarify what he had told you.

A. Yes, that is what he had told me.

2 RP (Oct. 30, 2023) at 699-700.

Cassandra Grubb testified that Jason Wood told her that he walked into John Trendowicz's room at the Redtop Motel and saw Trendowicz dead. Jason Wood contrarily testified that he never entered the room and saw Trendowicz dead. Defense counsel did not specifically ask Wood, however, whether he told Grubb that he walked into the room or that he saw Trendowicz dead.

11

The trial court denied Michael Perry's application to allow Cassandra Grubb's testimony as to Jason Wood's comments about being unable to unsee the scene. In its oral ruling, the court listed six related reasons for denying the application. First, Michael Perry's primary purpose of questioning Cassandra Grubb was to establish the truth that Jason Wood saw the dead body and could not unsee the gruesome details, not to impeach Wood. Second, the probative value for impeachment purposes was "incredibly low." 2 RP (Oct. 30, 2023) at 709. Third, the prejudicial effect of the testimony to the State was "incredibly high." 2 RP (Oct. 30, 2023) at 709. Fourth, the risk of confusion was high because, due to the phraseology of the questioning, Grubb could answer the question "no" even though part of the answer is "yes." The question combined two purported statements of Wood. Fifth, counsel did not lay a sufficient foundation when questioning Wood for purposes of his later impeachment. Sixth, any claim that Wood saw the dead body conflicted with the evidence, if not undisputed facts. There was testimony that Wood left the hotel room early in the morning on the day of the murder before others overheard a quarrel between Michael Perry and John Trendowicz. The surveillance footage from that day began at 8:00 a.m. and ended at least by 2:00 p.m. Wood was never seen in that footage. The video also established that no one reentered Trendowicz's hotel room after Perry left. The front door was the only access to the hotel room except for a back window too small for a person to enter.

I disagree with some of the trial court's reasons for precluding Cassandra Grubb's impeachment testimony. I also disagree with one of the majority's assertions.

12

The majority writes that Grubb's testimony was hazy as to whether Jason Wood actually saw the dead body with its surrounding blood or whether Wood reported what another told him. The weight of the testimony can only be read, however, that Wood told Grubb he entered the hotel room and saw the bloody scene. The majority also wishes to rely on what Grubb told detectives in an earlier interview as to her conversation with Wood as relayed in a police report. But Grubb did not speak to law enforcement under oath. Also, a witness need not testify consistent with a statement given to law enforcement. An officer's report is not inerrant scripture.

I disagree with the trial court that Cassandra Grubb's testimony was prejudicial to the State or that any prejudice to the State outweighed the benefit to Michael Perry. Because of Jason Wood's lack of memory, the impact of this testimony against the State would be slight. The testimony assisted Perry to a limited extent, however. The testimony placed at least one other person in the hotel room near the time of death.

I disagree with the trial court's ruling that defense counsel failed to lay a proper foundation. In accordance with ER 613(b), counsel confronted Jason Wood with the statement he purportedly uttered to Cassandra Grubb, and counsel gave Wood the opportunity to explain or deny uttering the statement.

The trial court correctly noted the compound nature of the question asked by Michael Perry's counsel to Jason Wood. Counsel asked Wood if he told Grubb that he could not unsee what he saw and could not get those images out of his head. Although the two concepts of being unable to unsee and being unable to remove images from one's

head are the same, Wood could have said one to Grubb, but not the other. Still, the trial court could have instructed defense counsel to disassemble the compound question. The compound nature of the question should not have precluded the questioning.

I would affirm the trial court's ruling excluding the impeachment evidence on the basis that no evidence showed that Jason Wood entered the hotel room after the death of John Trendowicz. As outlined above, the testimony and video surveillance showed that Wood did not return to Trendowicz's room after the homicide. Thus, any evidence would confuse the jury because the testimony wrongly assumed that Wood entered the room after the murder.

*Prejudice*

The majority and I agree that trial defense counsel should have objected to the showing to the jury and the admission as an exhibit of booking photographs of Michael Perry. I also conclude that defense counsel should have objected to the testimony of Detective James Hall that Jason Wood, during the detective's interview, expressed sympathy for John Trendowicz. Finally, defense counsel should have objected to Hall's description of the demeanor of Wood when Wood testified during trial. Despite these two additional errors, I still conclude Perry suffered no reversible error.

An error in a trial does not merit reversal unless the error prejudiced the defendant. *State v. Grenning*, 169 Wn.2d 47, 57, 234 P.3d 169 (2010); *State v. Cunningham*, 93 Wn.2d 823, 831, 613 P.2d 1139 (1980). The test of harmless error differs depending on whether the error was constitutional or nonconstitutional in nature. Under the

14

nonconstitutional harmless error standard, the accused is not entitled to a new trial unless he shows that, within reasonable probabilities had the error not occurred, the outcome of the trial would have been materially affected. *State v. Calegar*, 133 Wn.2d 718, 727, 947 P.2d 235 (1997). The improper admission of evidence constitutes harmless error if the evidence is of minor significance in reference to the overall, overwhelming evidence as a whole. *State v. Bourgeois*, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997).

I fault the harmless error doctrine for two reasons. First, a court in a jury trial should not be weighing evidence to determine the guilt of the accused. The harmless error doctrine turns this reviewing court into a super-jury or factfinder of guilt. Second, the test of harmless error includes the concept of how a reasonable jury would vote if the trial had not been contaminated by error. But many accused are acquitted because one or more jurors consider the facts or law unreasonably. The harmless error doctrine removes this benefit from the accused. I must apply the doctrine, nonetheless.

I already concluded that the booking photographs constituted harmless error. The admission of Detective James Hall's opinion as to Jason Wood's demeanor while testifying at trial was insignificant because the jury already heard Wood's indecisiveness. Detective Hall's reporting of Wood's sympathy to John Trendowicz was insignificant because even the killer likely would have expressed sympathy when talking to law enforcement.

More importantly, overwhelming evidence, as more thoroughly outlined by the majority, supported the conviction. Terry Grimm and Leonard Silvey established that

John Trendowicz remained alive at the Redtop Motel as late as 10:39 a.m. on the day of the murder. Perry was overheard vociferously arguing with Trendowicz that morning. Video surveillance showed that only Perry left or entered Trendowicz's room between 10:30 a.m. and the discovery of Trendowicz's deceased corpus at around 1:15 p.m. Michael Scalera witnessed Perry burning clothing near the Spokane River later in the day after Trendowicz was killed. Forensic testing revealed Trendowicz's DNA in a splotch, consistent with blood, on Perry's head after he was arrested that same evening.

Christopher Helms possessed John Trendowicz's money. Yet, footage showed he left Trendowicz's room at 10:00 a.m. on the day Trendowicz was killed. Two days later, Helms was seen wearing what appeared to be the same clothing. He again wore the same t-shirt and a rubberized bracelet when he was interviewed by Detective James Hall nearly two weeks after the murder. Both items were collected at the interview and tested. Helms also provided a DNA sample. Neither the t-shirt nor the bracelet showed any presence of blood.

Fearing, J.P.T.